**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | 1:17cr00013 |
| | ) | **Electronic Filing** |
| **MICHAEL ROBERT HEINRICH** | ) | |

## OPINION

On December, 11, 2018, a grand jury returned a second superseding indictment charging Michael Robert Heinrich ("defendant") at Counts One through Five with Sexual Exploitation of a Minor, in and around January 2017, in violation of Title 18, United States Code, Sections 2251(a) and 2251(e), at Counts Six through Fifteen with Sexual Exploitation of a Minor, in and around February 2017, in violation of Title 18, United States Code, Sections 2251(a) and 2251(e), and at Count Sixteen with possession of material depicting the sexual exploitation of a minor, from in and around January 2017 to in and around May 2017, in violation of Title 18, United States Code, Sections 2252(a)(4)(B) and 2252(b)(2).  Presently before the court are defendant's notice/motion to proceed with expert testimony on the issue of *mens rea* and the government's motions to exclude defendant's proposed expert testimony.  For the reasons set forth below, defendant's notice/motion will be denied and the government's motions will be granted.

The government is prepared to offer evidence supporting the events that follow.  In January and February of 2017, defendant was doing some painting at the house of a couple who considered defendant to be a close family friend.  The couple, J.C. and M.C., had two very young female granddaughters, E.C. and L.C..  E.C. was approximately 5 years-of-age and L.C. was approximately 3 years of age at the time.

On February 14, 2017, defendant brought the young girls Valentine's Day gifts and spent time painting in the basement. The girls were there with him. While defendant was painting, M.C. was upstairs preparing dinner and J.C. was still at work. Thereafter, defendant departed. M.C. and J.C. observed defendant with a camera on that date.

At the evening meal, E.C. revealed to her parents that while she was sitting on the couch in the basement playroom, defendant tried to pull her pants down, but she told him "no." Defendant then pulled her pants off anyway and took photographs of her genitalia and buttocks. M.C. and J.C. reported these revelations to the Pennsylvania State Police.

On February 20, 2017, State Troopers interviewed defendant. He acknowledged that he was at the residence on Valentine's Day but denied taking nude photographs of the children. He stated he took pictures of them in their clothes. He also disclosed that he had wiped E.C.'s butt because it was dirty from defecating but he did not touch her vagina. He also admitted that he had downloaded nude pictures of other underage children while on the internet.

During the interview defendant agreed to and executed a waiver of rights and consent to search form. A laptop computer, a tower computer, two cameras and a cellular telephone were seized.

On May 22, 2017, the investigating officers obtained a warrant to search the seized items. A forensic examination of the items uncovered several images of E.C. in various positions with her vaginal area exposed and the focus of the image. Several depicted a man's hand spreading the buttocks and vaginal area of E.C. Others depicted a man's hand holding E.C.'s leg and body in position to capture the exposed image of her genital area. Another depicted L.C. on her knees and bent over with her backside and vaginal area exposed. The metadata from these images indicates they were taken on February 14, 2017.

A 24 second video clip also was discovered.  In the video, E.C. is wearing a one-piece pajama that had been unzipped.  She is positioned so her chest and vaginal area are in focus and exposed.  A man's voice can be heard saying "stay there, you're fine, just fine.  You're very pretty, stay there."  The government indicates the man speaking is defendant.  Four still images were also discovery with E.C. in the one-piece pajama.  Her chest and vagina are exposed in the images.  The metadata from all these images indicates they were taken on January 16, 2017.

The forensic examination further revealed pictures of other very young children.  One has an infant on a changing table with an adult male's erect penis placed on her vaginal area.  Another depicts a prepubescent girl dressed in a blue outfit and standing in a modeling pose, exposing her chest and vaginal area.  The label "LS Models" is embedded in this image.  Another depicts a naked minor female with her genitals exposed and using a sex toy.  See generally Doc. No.s 58 at pp. 1-2 and 63 at pp. 1-2.

The government will seek to introduce into evidence the still images of E.C. that form the basis for Counts One, Two and Four through Eight, as well as the 24 second video clip of E.C. that forms the basis for Count Three.  The image of L.C.'s backside with her exposed genitals and pubic area in focus will be proffered in support of Count Nine.  According to the government, defendant has offered to stipulate that the images in support of Counts One through Nine are "child pornography" and portray actual minors engaging in sexually explicit conduct.  Doc. No. 63 at p. 3.

The images supporting Counts Ten through Fifteen consist of additional images of E.C. Count Ten is based on an image of E.C. from her backside wherein her vaginal area and derriere are exposed, along with defendant's hand resting on the small of her back.  Count Eleven is based on an image focusing on E.C.'s exposed vaginal area, with defendant's hand wrapped

around her leg and holding it in place.  Count Twelve is based on an image were defendant's hand is spreading her vaginal area open for the photograph.  Count Thirteen is based on an image of E.C.'s exposed vaginal area with defendant's hand holding E.C. in place.  Count Fourteen is based on an image of E.C.'s exposed vaginal area taken a bit further away so you can see her face and defendant's hand.  Count Fifteen is based on a depiction of E.C.'s vaginal area along with defendant's hand.  Count Sixteen is based on the collection of images of minors other than E.C. and L.C. that were downloaded from the internet.  <u>See</u> Doc. No. 85 at pp. 1-2.

On February 8, 2019, defendant filed a notice of intent to introduce expert evidence relating to mental disease or defect or mental condition bearing on the issue of guilt with respect to the production charges at Counts One through Fifteen.  <u>See</u> Notice of Expert Evidence of a Mental Condition (Doc. No. 80).  On March 4, 2019, the government filed its first motion to exclude expert testimony and thereafter submitted to the court a copy of an expert report authored by Dr. Schwartz, a licensed psychologist, a certified diplomat in Sex Therapy and a retired Adjunct Professor of Psychiatry at the University of Pittsburgh School of Medicine.  The grounds for exclusion included the lack of any specific intent element in the crimes charged, the evidence being barred by Rule 704 and the lack of relevancy under Rules 401 and 403 of the Federal Rules of Evidence.  Motion to Exclude (Doc. No. 83).  The motion has been briefed.

On March 19, 2019, the government filed a second motion seeking to exclude the same evidence on the grounds that it has been produced by unreliable testing and seeks to introduce for the jury's consideration unsound, inappropriate and unsupported conclusions.  Motion to Exclude Expert testimony Under Federal Rule of Evidence 702 (Doc. No. 95).  This motion likewise has been briefed.

On March 24, 2019, a Memorandum Order was issued providing the parties with rulings on certain issues raised by the pending motions and the parties' submissions in conjunction therewith.  The specific rulings were the following:

1) The counts of production charged at counts one through fifteen of the Second Superseding Indictment are specific intent crimes within the traditional meaning of that phrase;

2) The court's jury instruction will track the statutory language on the required showing of purpose.  In order to meet this component of the statutory elements, the government will only be required to prove that a significant or motivating purpose of defendant in using or inducing a child to engage in sexually explicit conduct was to obtain a visual depiction of that sexually explicit conduct.  The government will not be required to prove that producing a visual depiction was the sole or dominant purpose of the defendant's actions; and

3) The government may meet its burden as to purpose solely by circumstantial evidence.

Memorandum Order of March 24, 2019 (Doc. No. 100) at 1-2.

In support of these rulings, this court highlighted among other cases the opinion by the United States Court of Appeals for the Fourth Circuit in United States v. Palomino-Coronado, 850 F.3d 127 (4th Cir. 2015), where the court squarely confronted the issue of whether 18 U.S.C. § 2251(a) is a general or specific intent crime.  The Fourth Circuit opined:

As the text indicates, § 2251(a) contains a specific intent element: the government was required to prove that production of a visual depiction was a purpose of engaging in the sexually explicit conduct. [18 U.S.C. § 2251(a)]; see United States v. Lebowitz, 676 F.3d 1000, 1013 (11th Cir. 2012). "It is simply not enough to say 'the photo speaks for itself and for the defendant and that is the end of the matter.'"  United States v. Crandon, 173 F.3d 122, 129 (3d Cir. 1999) (discussing the purpose requirement in the related cross-reference under U.S.S.G. § 2G2.1(c)(1)).  That is, a defendant must engage in the sexual activity with the specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture.  Nonetheless, courts do not require that a defendant be single-minded in his purpose to support a conviction under § 2251(a).  E.g., Lebowitz, 676 F.3d at 1013; United States v. Morales-de Jesus, 372 F.3d 6, 21–22 (1st Cir. 2004); see also United States v. Cox, 744 F.3d 305, 309 (4th Cir. 2014) (considering "purpose" in the context of the application of a cross-reference under §

2G2.1(c)(1) of the sentencing guidelines governing production of some child pornography offenses).

Id. at 130-31.  This court further noted that a number of other courts of appeals have reached the same conclusion.  Memorandum Order of March 24, 2019 (Doc. No. 100).  It highlighted the following body of authority in support:  United States v. Battle, II, 695 F. App'x 677, 679 4th Cir. 2017) ("Thus, the defendant must act with the specific intent that a visual depiction be produced. . . .");  United States v. Torres, 894 F.3d 305, 312 (D.C. Cir. 2018)  ("evidence of purpose is essential" and "there must be proof that the defendant used, induced, or otherwise caused sexually explicit conduct by the minor for the purpose of producing images of that conduct.");  Cf. Lebowitz, 676 F.3d at 1031 (to sustain a conviction under § 2251(a), the government must prove that the defendant had the child engage in the sexual activity for the purpose of producing a visual depiction thereof; Ortiz-Graulau, 526 F.3d at 19 (§ 2251(a) has a requirement that the sexually explicit conduct must have been brought about for the purpose of making a visual depiction of it).  And a panel of the United States Court of Appeals for the Third Circuit has endorsed this construction of the statute.  See United States v. Smith, 662 F. App'x 132, 135-36 (3d Cir. 2016) (acknowledging that § 2251(a) requires the government to prove the requisite specific intent and concluding that the defendant's photographs of the child in lascivious poses, stored in a computer folder with a sexually explicit title along with other images of the child in lingerie, provided strong circumstantial evidence that the defendant "intended the sexually explicit conduct to occur for the purpose of producing the photographs.").

After concluding that the above collection of authorities provides ample support for the proposition that § 2251(a) contains a specific intent element and joining this growing consensus, this court further held that it would track the statutory language when charging the jury on the required showing of purpose: Torres, 894 F.3d at 310, 318 (affirming conviction based on charge

which tracked the statutory language pertaining to the defendant's purpose); United States v. Starr, 533 F.3d 985, 997 (8th Cir. 2008) (instruction that sufficiently tracked the statutory requirement as to purpose was not subject to due process attack on theory of variance or constructive amendment); United States v. Sirois, 87 F.3d 34, 39 (2d Cir. 1996) (trial court properly instructed the jury that it is enough for the government to show that the purpose of the illegal sexual activity was for the production of a visual depiction of that activity). In meeting this element of the crime, the government is not required to prove that producing such an image was the sole or dominate purpose of the defendant. Sirois, 87 f.3d at 39 (rejecting sole dominant purpose charge and upholding jury instruction indicating the government need only prove that the production of the visual depiction was one of the defendant's dominant purposes) (collecting cases in support); Torres, 894 F.3d at 314-15 (refusing to read a single-purpose limitation into § 2251(a) and opining that a jury need only find that "at least some of [the sexual conduct] was to produce images of such conduct"); Battle, II, 695 F.3d at 680 (while a defendant must act with the specific intent that a visual depiction be produced, this need not be his only purpose in having the child engage in sexually explicit conduct); Ortiz-Graulau, 526 F.3d 19 (a defendant need only have a purpose to make a visual depiction of the sexually explicit conduct); Lebowitz, 676 F.3d at 1031 (Rejecting "single-minded" purpose construction and holding that "[s]ection 2251(a) required the Government prove beyond a reasonable doubt that one purpose of the sexually explicit conduct was to produce a visual depiction."); Starr, 533 F.3d at 997 ("[t]he criminal law applies to everyone, not just the single-minded.").

Finally, this court opined that "where the issue of purpose is raised, sufficient authority supports [a jury] instruction that indicates the government may meet its burden by proving that the intent to produce a depiction of the sexually explicit conduct was "a significant or motivating

purpose" of the defendant.  Memorandum Order of March 24, 2019 (Doc. No. 100) at 4.  It

likewise set forth support for the ruling that "the government may meet its burden of proving the

requisite purpose entirely by circumstantial evidence."  Id.


     Argument on the government's pending motions to exclude was held on March 25, 2019.[1]

Defendant advanced the following proffer:

     Dr. Schwartz is a licensed psychologist and certified sex therapist here in
Pennsylvania.  Your Honor, he intends to proffer the following information about Mr.
Heinrich's background. His age, his marital status, his parental status, information from his
childhood, including the chaos, neglect, deprivation, and abuse that he suffered.  Dr.
Schwartz will talk about death and loss that Mr. Heinrich experienced throughout his life,
including his wife, who passed away from cancer in 1987, and both his mother and his
brother who died in early 2015.

     Dr. Schwartz will be asked to testify about Mr. Heinrich's health issues at the time
they existed at the time of the offense, in which eight months prior to he had had a heart
attack and was on medication that regulated his blood pressure.  He'll talk about his
employment history as a photographer and as an artist and a handyman.  In addition, he'll
also talk about his sexual history and interest.

     In particular, Your Honor, that he has been tested repeatedly under numerous
psychological testing procedures to determine that he's, in fact, not a pedophile and does
not have a sexual interest in prepubescent minors.  Your Honor, he will also testify about
approximately eight -- nine different psychological testing procedures, ranging from his
interviews with Mr. Heinrich, the various psychological tests such as the Minnesota
Multiphasic, . . . , Personality Inventory Test, the Multiphasic Sex Inventory II Test, the
Psychosexual Life History Form, the Abel Assessment of Sexual Interest, the LOOK
Assessment of Sexual Interest, the Beck Depression Inventory, the Beck Anxiety
Inventory, and he'll also discuss his collateral interviews with Mr. Heinrich's sister and his
son.

     Ultimately, Dr. Schwartz will cull together this background information to discussion
Mr. Heinrich's psychodynamic functioning at the time of the offense, focusing on his
depression at the time, his life circumstances of loss and health issues, and his increased
hoarding behavior, which had begun in the years prior to offense.  Your Honor, he will

---

[1] On March 22, 2019, counsel were advised that the court wanted to focus on the portion of the
government's original motion raising a Rule 704(b) challenge to the expert testimony and they
were to prepare accordingly.  Defense counsel was directed to be prepared to place a proffer on
the record as to the specific areas of testimony that would be elicited from Dr. Schwartz.

also testify as to what Mr. Heinrich has discussed with him as having occurred when this offense -- what was Mr. Heinrich's perception and intent behind the circumstances that -- leading up to and during the alleged offense.  In that sense, he will testify, essentially, to Mr. Heinrich's world view and what he came to the table with as he engaged in these behaviors on January 16, 2017, and February 14, 2017.  Lastly, Your Honor, he would render a conclusion that Mr. Heinrich genuinely believed that he was creating art and capturing the beauty and innocence of the children when he took the photos.  And that's it, Your Honor.

Motion Hearing, March 25, 2019.

Defendant's proffer at the hearing was consistent with Dr. Schwartz's expert report. Therein, Dr. Schwartz indicates defendant is charged with possession and production of child pornography and the purpose of his assessment is to evaluate defendant's psychological state regarding psychopathology and psychosexual functioning as these relate to understanding the motivations for his behavior, in particular to his alleged production of child pornography.  Dr. Schwartz conducted a structured two-hour clinical interview wherein the battery of referenced testing was administered and thereafter a subsequent two-hour interview once the test results were available.  Through defendant's accounts, Dr. Schwartz became familiar with defendant's physical and behavior presentations and defendant's abusive childhood - which was the product of being raised by a mother who did not want him and in a family in poverty.  Dr. Schwartz also became aware of the significant number of tragic losses defendant has experienced, starting with the death of a girl he liked in first grade, his wife dying from cancer in 1987 and the disheartening circumstances surrounding the care he had to provide to his wife, and his brother whom he was close with and his mother dying in February and March of 2015.  Dr. Schwartz also interviewed defendant's sister and son in an effort to obtain collateral information.

Dr. Schwartz used the information obtained to formulate a "psychodynamic formulation" about defendant.  He opined that although defendant was not currently depressed, there was

evidence of depression resulting from the multi-family deaths and defendant undergoing back and heart surgery approximately eight months prior to the events giving rise to the charges. There also was evidence that defendant underwent changes in personality, developed distorted thinking and behaviors, and his hoarding activity increased dramatically.

Dr. Schwartz concluded that defendant's photography can be understood as an extension of his hoarding behavior, in part because defendant reported taking pictures of "everything," especially those things that defendant sees as "beautiful." Through this behavior, defendant has a way of capturing and holding on to things, which is a way for defendant to defend against loss.

Dr. Schwartz sough to synthesize the impact of defendant's early trauma and loss. In doing so, he noted that defendant consistently denied being sexually attracted to children and the test results strongly supported his lack of interest in prepubescent children. But he does see beauty in children, similar to the way he views the world. Dr. Schwartz then opines:

> The central referral question is to evaluate [defendant's] state of mind when taking the pictures to ascertain whether he intended to create child pornography or whether the photos had a different meaning for him. In order to ascertain this, it is important to understand [defendant's] psychodynamics; that is, to understand his personal experience through his eyes when he was taking the photos, to identify his thoughts, attitudes and feelings associated with the behavior in question.
>
> Those without therapy often end up "telling" or re-enacting the story of the abuse in a dysfunctional way. This is called the "compulsion to repeat" trauma that reenacts some aspect of the traumatic narrative with the hope of a better ending that never occurs. This represents a failed attempt to be saved or find personal redemption. Thus, for some, not all, it's a dysfunctional and ultimately misguided attempt at healing and redemption that paradoxically does harm, either to real children or indirectly to those who were filmed. This is a similar situation, as seen below, regarding [defendant's] re-enacting a narrative of failed redemption in a dysfunctional way.

Report of Dr. Schwartz at Section IV, B.

Dr. Schwartz next provides an account of defendant's "narrative." Defendant sees beauty in diverse things, including women and children. To him, children modeling for designer

clothing manufacturers often are portrayed in images reflecting "perfect art."  Photography

provides a way of capturing such beautiful images as frozen in time.  And for defendant, "the

image of beautiful young children represents a state of purity and perfection."

Dr. Schwartz then sets forth defendant's narrative of the events that result in the pictures

underlying the charges of production at Counts one through Fifteen.  In this account, defendant

describes in detail his interactions with the victims, the things he said and the things he did

during the events that led to the images.  This included taking pictures of victim one in a state of

undress on the bed after this child, age five, refused to get dressed.  In his mind, he was capturing

beauty frozen in time and preserving what he saw as her pure and innocent state so that image

would not be lost.

In a separate instance, defendant was with victim one, who had her tights pulled down

and was bent over the couch.  Her state of undress revealed dried excrement.  Victim two, age 3,

began to imitate the behavior of victim one.  Defendant thought their backsides looked adorable,

so he made several trips to the sink to clean the excrement and took pictures.

Dr. Schwartz offers the following as to these events:

Similar to [defendant's] childhood experiences, he noted that children's mother often yelled
at them, did not give them attention, and did not teach them to adequately care for their
cleanliness, a virtue that was strongly emphasized by his grandmother.  He spoke with
pride about having cleaned his soiled wife when she lost bowel control during her cancer
and how he was protective with raising his son.  Thus, in his view, cleaning the rear of the
children after "pooping" was nothing sexual, but a protective and nurturing act of caring.
Capturing this in a photo was, as above, a form of "freezing in time" the beauty of moving
from dirty to clean, or from neglected, damaged child to the cared for and cleaned child.
The central theme that [defendant] repeatedly talked about and lamented was that of the
damage inevitably done to almost every child and the sorrow that he felt about his tragic
view of life.  His misguided and confused attempt at finding a redemptive resolution to this
tragedy led him to see the purity of the undamaged child in images of their naked bodies,
blinding him to the social conventions and legal constraints.

Id.

11

Dr. Schwartz concluded:

The obvious problem is that [defendant], driven by these psychological dynamics, created not merely very bad "art", but illegal and harmful images.  His painful history as a "damaged" child led him to capture on film what he inappropriately saw as images of beauty, purity and innocence.  He now acknowledges that this showed very poor judgment and was wrong.  Indeed, [defendant] reported that he previously acknowledged the images he took were inappropriate when, after viewing them, he realized they failed to capture his intended content and effect and he deleted them (or at least attempted to do so).

On the basis of intensive interviewing [defendant] about his thoughts during and after the picture taking, together with the convergent test results that indicate no sexual interest in prepubescent children, it is my professional opinion he did not plan or intend to create pornography.

Id.

Defense counsel explained in his argument the relevance of the above.  He posited:

[W]hat motivates an individual and the effect of their psychological state and their life circumstances that causes them to act in a certain way is not [within] the typical province of a jury.  That is something that an expert is certified and permitted to testify routinely by courts to help bridge that understanding, that factual gap, that conceptual gap so the jury can make an informed decision, and incorporate the facts of the case till they can apply the facts of the law as you give it to them.  So, Your Honor, an average juror isn't going to understand why Mrs. Heinrich's passing in 1987 of cervical cancer and [defendant] needing to clean up after his wife, to wipe his wife, to clean her every time she went to the bathroom, why that would have a profound effect on an individual 30 years later, such that they would want to capture that moment when he was caring for a grandchild of a close family friend; why that would be a re-living of an important moment in his life and why that would inform the jury's determination if he, in fact, had the guilty mind to break the law in this case.

And, Your Honor, I submit that Section 2251(a) requires that the Government prove beyond a reasonable doubt that he intended to create child pornography, not merely that he intended to take a photo.  The First Amendment concerns that were at play when Congress passed these laws and the circumstances that led Congress to seek to protect children from this type of behavior were to try to prevent people from wanting to create child pornography, not to prevent children being photographed sometimes in the nude.  There is art out there, Your Honor, which is protected by the First Amendment, where individuals are allowed to take photos that have certain let's say value in a democratic society.  But the Supreme Court said that runs against abuse against children.

But here, Your Honor, the facts that the Government will adduce at trial is that [defendant] took two sets of photos; one on January 16, 2017, [and] one on February 14, 2017, a month later. They will show that on the first time they approached [defendant] on February 20, 2017, he admitted to taking those photos, he handed over all his equipment, and all those photos were deleted off that equipment. The law is not intending to criminalize and punish people who believe that they are taking and creating art, who upon review realize that it is not art and they get rid of it. This is -- that is why specific intent and purpose were read into [section] 2251, because it says if an individual intends to create child pornography, that then they are guilty of an offense; an offense for which 180 months minimum applies and a life maximum applies.

* * *

What I intend to argue to the jury [in] closing argument, is Mr. Heinrich inadvertently created child pornography.

Transcript of March 25, 2019, Hearing.

When further questioned as to how the expert's account of defendant's actions fit into the

determinations to be made by the jury, defense counsel proffered:

The expert will explain how [defendant's] mental health issues at the time of the offense informed his decision to take a photo that objectively should not have been taken. [He] will explain and translate to the jury why someone in [defendant's] position could have thought it was appropriate, but that upon review, he deemed was inappropriate. When law enforcement came to his house on February 20th, these photos were not there anymore.

Id.

The government advanced the following in opposition:

[I]t's our position that if you read the cases from [United States v. Pohlot, 827 F.2d 889, 896 (3d Cir.1987)] moving forward, you see time and time again the Third Circuit and other circuits cautioning District Courts on admitting this type of testimony, telling District Courts, you need to be extremely cautious in admitting this testimony. And your skepticism, not only [] I submit to you is entirely accurate for you to be skeptical about the proffer that you heard, but your skepticism is also borne out of that line of cases from Pohlot moving forward. And even Rule 704(b), in the way that Congress constructed it, was meant to reflect skepticism about this type of testimony. And it's not enough to just say, well, you can't -- you can't actually verbalize in front of the jury that the Defendant did not have the intent to commit the crime, because allowing an expert to testify, to say, well, he just intended to create beauty and art, that's the same thing. It's the same thing as saying he didn't have the intent to commit the crime, if you let the expert testify what the intent

was.  And the concern in all these cases is you're basically allowing a Defendant to get away with presenting his version of events through an expert witness with the intent of making it seem more legitimate because I'm presenting it through the lens of an expert witness.

Rule 704(b) makes clear, it could not be clearer that an expert can't testify as to whether the Defendant did or did not have the state of mind required.  But what's significant here is they have the wrong state of mind.  I do not have to prove in this case that when he took those photos, he was intending to create child pornography or that he had a thought in his mind, I'm not creating art here, I'm creating child pornography.  As we put in our papers and as you already found in your earlier order, there is no requirement on us to show that when he took those photos, he was intending to create child pornography.  And the purpose provision of the statute lays out exactly what we have to show.  I simply have to show you, Mr. Heinrich, engaged a minor in some sort of sexual activity that falls under the statute.  Either a sex act or lascivious exhibition of the genitals, which is what we have here.  And that when [he] did that, [he] did that with the purpose of taking a picture of it.

I don't then have to show the extra state of mind that when he did that, he thought in his mind he was making child pornography.  And if they get the intention wrong or the intent or the *mens rea* that I have to prove here wrong [], then their expert testimony is not admissible.  The cases say that over and over and over again.  And <u>Pohlot</u> actually completely undermines their position.  The Court in <u>Pohlot</u> said, only in the rare case however, will even a legally insane Defendant actually lack the *mens rea* purely because of mental defect.  A man who commits murder because he feels compelled by demons still possesses the *mens rea* required.  The Government's burden of proving *mens rea* is, therefore, considerably less onerous than its previous burden of proving sanity.

<u>Id.</u>

We agree with the government that Dr. Schwartz's testimony is inadmissible.  It will be excluded for a myriad of reasons.

In this context, the district courts are vested with "broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trial of fact."  <u>United States v. Bennett</u>, 161 F.3d 171, 182 (3d Cir.1998).  "This includes the 'broad discretion to exclude expert testimony that is not offered as part of an insanity defense or to negate the *mens rea* element of a crime.'"  <u>United States v. Andrews</u>, 811 F. Supp.2d 1158, 1169 (E.D. Pa. 2011) (quoting <u>United States v. Baxt</u>, 74 F.Supp.2d 436, 441 (D. N.J. 1999).

Exercising this discretion starts with an understanding of the perimeters and prohibitions that Congress has established in this area.  In the aftermath of the attempted assassination of President Ronald Reagan, Congress passed the Insanity Defense Reform Act ("IDRA"), making it "an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts," and legislating that "[m]ental disease or defect does not otherwise constitute a defense." Andrews, 811 F. Supp.2d at 1169 (quoting 18 U.S.C. § 17(a)).  The IDRA abolished the volitional prong of the insanity defense under the Model Penal Code, "which had permitted acquittal if the defendant 'as a result of mental disease or defect . . . lacks substantial capacity . . . to conform his conduct to the requirements of the law.'"  Id. (quoting Pohlot, 827 F.2d at 896) (quoting Model Penal Code § 4.01 (1962)).  "The IDRA 'also shifted the burden of proof, requiring the defendant to prove insanity by clear and convincing evidence.'"  Id.; accord 18 U.S.C. § 17(b).

In Pohlot, the Court of Appeals for the Third Circuit considered whether any forms of evidence pertaining to mental abnormality remained admissible after the IDRA was enacted.  In doing so, the court identified three general categories of evidence that arise in this context: (1) "evidence of mental abnormality to negate *mens rea*"; (2) evidence of mental abnormality that shows a defendant "lacked the capacity to form the *mens rea*"; and (3) evidence of mental abnormality to demonstrate that the defendant is less culpable and deserves mitigated punishment.  827 F.2d at 903–04.  The court held that after the IDRA, only the first type of evidence - evidence of mental abnormality to negate *mens rea* – remains admissible.  Id. at 905. In contrast, "[e]xpert psychiatric testimony concerning 'unconscious motivation,' 'impaired

volitional control,' or an 'inability to reflect on the ultimate consequences of one's conduct' is inadmissible." United States v. Baxt, 74 F. Supp.2d 436, 440 (D. N.J. 1999) (quoting United States v. Cameron, 907 F.2d 1051, 1061 (11th Cir. 1990)).

"Unlike the other two types of evidence, evidence of mental abnormality to negate *mens rea* is admissible because it is not a 'diminished capacity' or 'diminished responsibility' defense, 'but merely a rule of evidence,' Pohlot, 827 F.2d at 903, that is relevant to the determination of whether the Government has established the intent element of a crime." Andrews, 811 F. Supp.2d at 1170. But "a lack of self-reflection does not mean a lack of intent and does not negate *mens rea*." Pohlot, 827 F.2d at 906. This is because proposed psychiatric testimony suggesting that a defendant lacks *mens rea* often focuses not on the defendant's intent but on the defendant's awareness of intent or the lack of such awareness. Id. But a state of lacking self-awareness in whole or in part falls short of a complete lack of *mens rea* even though the individual "is not fully conscious of his actions in the usual sense." Id. This is because in the Anglo-American system of jurisprudence, a mere lack of self-awareness or appreciation of the full consequences of one's actions does not render actions taken with that state of mind devoid of purpose or intent. As Judge Becker in Pohlot observed:

> [c]riminal responsibility must be judged at the level of the conscious. If a person thinks, plans and executes the plan at that level, the criminality of his act cannot be denied, wholly or partially, because, although he did not realize it, his conscious was influenced to think, to plan and to execute the plan by unconscious influences which were the product of his genes and his lifelong environment.

Id. at 906 (quoting State v. Sikora, 210 A.2d 193, 202 (N.J. 1965).

"[T]he Congressional prohibition of diminished responsibility defenses requires courts to carefully scrutinize psychiatric defense theories bearing on *mens rea*." Bennett, 161 F.3d at 18; accord Pohlot, 827 F.2d at 905 (Because of the "strong danger of misuse," district courts

are tasked with scrutinizing proffered psychiatric testimony carefully to determine whether the proof offered is grounded in sufficient scientific support to warrant its use in the courtroom, and whether it would aid the jury in deciding the ultimate issues.") (internal quotation marks omitted)).  In this regard, "[p]resenting defense theories or psychiatric testimony to juries that do not truly negate *mens rea* may cause confusion about what the law requires."  Id.  Thus, "[d]istrict courts should admit evidence of mental abnormality on the issue of *mens rea* only when, if believed, it would support a legally acceptable theory of lack of *mens rea*."  Pohlot, 827 F.2d at 905–06.[2]

The admissibility of psychiatric testimony about a defendant's mental state during the commission of an offense is further constricted by Rule 704 of the Federal Rules of Evidence.  It provides:

> In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense.  Those matters are for the trier of fact alone.

Fed. R. Evid. 704(b).  The accompanying advisory committee's notes explains:

> The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact.  In order to render this approach fully effective and to allay any doubt on the subject, the so-called "ultimate issue" rule is specifically abolished by the instant rule.
> * * *
> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time.  These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day.  They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

---

[2] Even where expert testimony is relevant to a legally acceptable theory of lack of *mens rea*, it must also satisfy the requirements of Rules 403 and 702 of the Federal Rules of Evidence.  Baxt, 74 F. Supp.2d at 441; see also United States v. Schneider, 111 F.3d 197, 201 (1st Cir. 1997).

Fed. R. Evid. 704 Advisory Committee's Note.

"Rule 704(b) applies to all instances in which expert testimony is offered as to mental state or a condition constituting an element of the crime charged or defense thereto."  United States v. Watson, 260 F.3d 301, 308 (3d Cir. 2001) (citation omitted).  This Rule prohibits not only testimony directly opining about a defendant's mental state, but also "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite *mens rea.*"  Bennett, 161 F.3d at 182 (3d Cir. 1998) (quoting United States v. Morales, 108 F.3d 1031, 1037 (9th Cir.1997)); accord United States v. Basheer, 2010 WL 4948960, *2 (3d Cir., Dec. 7, 2010) ("Rule 704(b) prohibits expert witnesses from opining or inferring that the defendant in a criminal case had the requisite mental state for the crime charged."); United States v. Wilson, 260 F.3d 301, 308 (3d Cir. 2001) (same).

In contrast, expert testimony may be presented under Rule 704(b) "if it merely 'support[s] an inference or conclusion that the defendant did or did not have the requisite *mens rea*, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'"  Bennett, 161 F.3d at 182 (quoting Morales, 108 F.3d at 1038).  "It is only as to the last step in the inferential process - a conclusion as to the defendant's mental state - that Rule 704(b) commands the expert to be silent."  United States v. Dunn, 846 F.2d 761, 762 (D.C. Cir. 1988).  "Th[e] burden of showing that proffered testimony is offered to negate the *mens rea* element of a crime and not in support of some improper defense theory falls squarely on the defendant."  Baxt, 74 F. Supp.2d at 441.

Defendant's proffered expert testimony is not admissible to negate *mens rea* under the teachings of Pohlot and runs afoul of Rules 704(b) and 403 in any event.  First, defendant

mischaracterizes the government's burden as to the specific intent required to establish guilt.  As this court's Memorandum Order of March 24, 2019, made clear, the specific intent that the government must prove is when a defendant used, enticed or caused a child to engage in sexually explicit activity, he or she did so for the purpose of producing a depiction of that sexually explicit activity.  See Memorandum Order of March 24, 2019 (Doc. No. 100) at pp. 3-5.  And in this regard the specific intent to produce a depiction of the sexually explicit conduct need only be "a significant or motivating purpose" of the defendant.  Id. (citing L. Sand, *et al*., MODERN FEDERAL JURY INSTRUCTIONS at §§ 62-5 and accompanying Comment; 62-6).

Defendant's efforts to require more are without foundation.  His attempt to extrapolate a requirement that the government must prove the defendant had the purpose of creating child pornography is unavailing.  United States v. Crandon cannot be read to establish any such requirement.  Crandon was 39 years of age.  He met a girl on the internet who was 14 years of age, traveled to meet her and then engaged in sexual relations with her.  He took 48 photographs of girl, 2 of which were sexually explicit.  At sentencing, the trial judge applied the cross-reference to production of child pornography in the sentencing guidelines.  In doing so, the trial judge refused to consider the defendant's purpose in creating the photographs prior to imposing sentence.  Crandon, 173 F.3d at 125, 129.

The Third Circuit reversed.  In an opinion by Judge Lewis, the court held that "the District Court erred in determining that Crandon acted 'for the purpose of producing a visual depiction of sexually explicit conduct' without permitting any actual examination or consideration of his purpose."  Id. at 129.  It reasoned:

It is simply not enough to say 'the photo speaks for itself and for the defendant, and that is the end of the matter,' as the government's position would dictate, when the statute makes specific reference to the defendant's purpose in taking the photograph.  Recalling the presumption against strict liability in criminal law, see Morissette v. United States, 342

U.S. 246, 250-63 (1952), it is critically important to be certain that the defendant's purpose was, in fact, to create pornographic pictures.  Crandon contends that his purpose in taking the pictures was the memorialization of his love for the girl, which had progressed to sexual intimacy, rather than the photographing of sexually explicit conduct.  See Appellant's Br. at 25.  Crandon thus posits a purpose arguably different from that proscribed by the statute.  We think it at least deserves to be heard.  Whether it is believed or not, or whether the distinction ultimately even makes any difference, is an entirely different matter.  Though doubtful, it is conceivable that Crandon did have alternative, perhaps even multitudinous, purposes in taking the photographs.  For instance, Crandon took approximately 48 pictures of the girl on his July visit.  Two were sexual in nature, while the remaining photographs were not.  Set in context, this fact could support his contention that his purpose in taking the photos was the memorialization of their time together or his love for her - a purpose other than producing sexually explicit material.  Our point is that some inquiry should have been made into Crandon's purpose, motivation or intent so that the District Court could make an informed assessment as to the applicability of the cross-reference.

Id. at 130.  It ultimately held: "[i]n determining whether to apply the cross-reference of § 2G2.2(c)(1), courts must consider the defendant's state of mind to ensure that the defendant acted 'for the purpose of producing a visual depiction of [sexually explicit] conduct.'"  Id.

It is apparent from defendant's briefing and arguments that he seeks to engraft into the elements of § 2251(a) a requirement that the defendant's purpose in taking sexually explicit photographs be, "in fact, to create pornographic pictures."  In other words, he seeks to require the government to prove beyond a reasonable doubt that the defendant had the intent to create a form of pornography sought to be made illegal by the statute as opposed merely to taking sexually explicit photographs of a child for any other purpose.

The court's discussion in Crandon cannot carry the weight defendant assigns to it. Crandon pled guilty to receipt of child pornography.  The cross reference for production of child pornography was applied without consideration of either the *actus reas* or the *mens rea* needed to support a conviction under § 2251.  And the trial judge simply refused to consider any offer about the defendant's purpose in taking the two photographs that met the definition of sexually

explicit conduct.  In other words, there was no finding based on reliable information that 1) the defendant had the minor engage in the sexually explicit conduct and 2) when he did so, he acted for the purpose of producing a visual depiction of that conduct.  Nevertheless, he was sentenced as if he did without even being heard on the issue of purpose.

Crandon did not address or consider the actual formulation of the elements of § 2251(a) or how those elements should be presented for a jury's consideration.  The court merely rejected the contention that the pictures, without more, could satisfy the government's burden to prove those elements and the application of the cross-reference.  And it found unacceptable the trial judge's unwillingness to even consider the defendant's proffer as to the attendant circumstances and his purpose in taking the photographs.  In other words, an informed inquiry as to the defendant's proffered purpose was appropriate before considering and resolving the application of the cross reference.  Id. at 130.

The Court in Crandon did contemplate that Crandon might be able to proffer some purpose that was different from the statute and that such a purpose might be able to displace any other inference about the defendant's purpose in a meaningful way.  That is, "a purpose other than producing sexually explicit material."  Id. at 130.   Other courts have reached the same conclusion.  See United States v. Palomino-Coronado, 850 F.3d 127 (4th Cir. 2015) ("All that the record shows is that Palomino–Coronado had engaged in sexual activity with B.H. on more than one occasion; that he had taken several non-sexually explicit pictures of her with his cell phone in his basement; and that one sexually explicit picture was taken, in which B.H. identified herself and Palomino–Coronado as the two people depicted.  Without more, these facts do not support the conclusion that Palomino–Coronado engaged in sexual activity with B.H. in order to take a picture.").

21

Both in Crandon and Palomino-Coronado, the courts rejected the notion that the specific pictures in question could, in themselves, satisfy the *actus reas* and *mens rea* of a § 2251(a) crime; that is, that the defendant initiated the sexual activity with the minor and did so with the purpose of producing a depiction of that sexually explicit conduct.  And both courts emphasized that to hold otherwise would run the risk of eliminating the specific intent requirement and turning § 2251(a) into a strict liability offense.  Crandon, 173 F.3d at 129; Palomino-Coronado, 805 F.3d at 132.

Notwithstanding these concerns, both courts did not engraft any additional requirement in to the elements needed to establish a § 2251(a) offense and each referenced the statutory language of the statute when directly addressing what the government must prove: the "courts must consider the defendant's state of mind to ensure that the defendant acted 'for the purpose of producing a visual depiction of [sexually explicit] conduct," Crandon, 173 F.3d at 130; "a defendant must engage in the sexual activity with the specific intent to produce a visual depiction; it is not sufficient simply to prove that the defendant purposefully took a picture[,] Palomino-Coronado, 805 F.3d at 131.  In other words, the government must prove that 1) the defendant had the child engage in sexually explicit conduct (*i.e.*, the *actus reas*) and when the defendant did so, at least one purpose defendant had in having the child engage in the sexually explicit conduct was to produce a visual depiction of that conduct (*i.e.*, the *mens rea*).  That the resulting visual depiction is or is not within the scourge sought to be regulated by the statute, *i.e.,* child pornography, is a characterization beyond the elements Congress chose to define an offense under § 2251(a).  And neither the court's opinion in Crandon nor any other authority cited by defendant supports the notion that the government should be shouldered with the burden of proving such an additional element.

The *mens rea* for conviction under 2251(a) consists of the government proving that when the defendant used or caused a minor to engage in sexually explicit conduct, one of the substantial purposes in doing so was to capture a depiction of that conduct.  The government need not prove that the defendant knew or appreciated that any resulting picture would be a form of "child pornography" sought to be made illegal by the statute.  Given this important distinction, Dr. Schwartz's extenuated explanations 1) as to how defendant perceived the pictures when he took them and/or 2) that defendant did not appreciate that the pictures were a form of socially unacceptable child pornography at the moment he took them unequivocally do not constitute a form of admissible testimony that negates the actual *mens rea* element of a § 2251(a) offense. They simply seek to provide avenues to excuse the conduct through a purported lack of self-awareness of intent and the social consequences of his actions. As such, the testimony is outside what remains admissible under <u>Pohlot</u> and/or 18 U.S.C. § 17.

The proffer of Dr. Schwartz's testimony likewise is inadmissible under Rule 704(b). Rule 704(b) is violated when the questioning of an expert is designed to elicit the expert's testimony about the mental state of the defendant, or refers to the defendant's intent, mental state, or *mens rea.*  <u>United States v. Watson</u>, 260 F.3d 301, 308 (3d Cir. 2001).  It likewise is violated when the testimony, if credited, raises an inference "that the defendant did or did not possess the requisite *mens rea.*"  <u>Bennett</u>, 161 F.3d at 182.

Dr. Schwartz purposes to testify about how the culmination of the painful history as a damaged child and the tragic events in defendant's life over many decades - from first grade, to thirty years ago, to two years before the charged offenses – culminated in a level of maladaptive psychodynamic functioning.  This maladaptive functioning manifested itself through, among other things, extreme hoarding behavior; and that hoarding behavior as it presented itself in

defendant's interest in photography contributed to what he inappropriately understood as an attempt to capture the beauty, purity and innocence of a young female child.  When he did so, he did not intend to create child pornography or immediately understand that he had done so.   It was defendant's misguided and confused attempts to find a redemptive resolution to his history of tragedy that led him to see the purity of the undamaged child in images of their naked bodies, and it further blinded him to the social and legal constraints that ordinarily would be recognized as being applicable to his conduct.  And through Dr. Schwartz's rendition of defendant's narrative, which Dr. Schwartz derived from two separate two-hour interviews of defendant and a series of tests conducted in conjunction with the first of those interviews, Dr. Schwartz seeks to explain what defendant was thinking when he took the photographs underlying Counts One through Fifteen and how he was only intending to capture the art, beauty and innocence of the young children before they experienced the inevitable damage and harm that eventually would befall them.  It was this psychodynamic functioning that led defendant to capture the images and not an intent to create child pornography or images that the laws pertaining thereto make unlawful.

Defense counsel's proffer as to Dr. Schwartz's testimony was focused on defendant's intent and purpose when taking the pictures.  There was no aspect of the proffer that had any meaningful relevance beyond Dr. Schwartz's account of what defendant was thinking and what defendant's intent was in creating the photographs underlying counts one through fifteen.  Merely phrasing the focus of the proffer as a lack of intent or purpose does not change the fact that the proffer is directly centered on what defendant purportedly was perceiving, thinking and intending when he took the pictures.  As such, the proffer failed to clear the bar erected by Rule 704(b).

Dr. Schwartz's report suffers from similar shortcomings.  As recounted therein, defendant's purported underlying painful history as a "damaged" child coupled with a long history of enduring tragic loss has only one focal point of relevance: it led to changes in defendant's personality and distorted thinking and behaviors, which in turn contributed to increased hoarding activity, which in turn caused him to seek to capture on film what he inappropriately saw as images of beauty, purity and innocence.  After the fact, defendant recognized that his behavior was based on very poor judgment and was wrong.  Based on defendant's account of his thoughts during and after the picture taking, together with the convergent test results that indicate defendant has no sexual interest in prepubescent children, it is Dr. Schwartz's professional opinion that defendant did not plan or intend to create pornography.

Dr. Schwartz's report is focused on defendant's intent and purpose when taking the pictures.  There was no aspect of the history recounted therein that has any meaningful relevance beyond Dr. Schwartz's account of what defendant was thinking and what defendant's intent was in creating the photographs.  Merely focusing on one way to understand what defendant was intending or attempting to do (as opposed to having a conscious awareness of violating the law or a desired purpose to do so) does not change the fact that the substance of the expert report is directly centered on what defendant supposedly was perceiving, thinking and intending when he took the pictures.  As such, the report and the relevance of any testimony to be derived therefrom fails to clear the bar erected by Rule 704(b).

Finally, even assuming some portion of Dr. Schwartz's proposed testimony would not be barred by Pohlot and/or Rule 704(b), it is clear that admitting it would be improper under Rule 403.  Rule 403 of the Federal Rules of Evidence provides: "[t]he court may exclude relevant

evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  "In weighing the probative value of evidence against the dangers . . . in Rule 403, the general rule is that the balance should be struck in favor of admission."  United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999) (quoting United States v. Dennis, 625 F.2d 782, 797 (8th Cir. 1980)).

Defendant seeks to introduce through expert testimony the impact of his abusive childhood, lifelong exposure to tragic events, and development of maladaptive behaviors to explain how and why he thought he was capturing art, beauty and purity and did not have the intent to create child pornography.  But none of these prior events and/or the consequences following from them supply or provide a cognizable defense to the charges in the indictment.

The contention that creating art and beauty constitutes a defense to a charge of production or the attempted production of child pornography directly has been rejected by the Supreme Court.  See New York v. Ferber, 458 U.S. 747, 758-66 (1982) (the states and federal government may criminalized the visual depiction of children engaging in sexually explicit conduct and the distribution of such materials without violating the First Amendment - "the States and the United States have passed legislation proscribing the production of or otherwise combating 'child pornography.'  The legislative judgment, as well as the judgment found in the relevant literature, is that the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the child.  That judgment, we think, easily passes muster under the First Amendment."); Ashcroft v. Free Speech Coalition, 535 U.S. 234, 249 (2002) ("Where the images are themselves the product of child sexual abuse, Ferber recognized that the State had an interest in stamping it out without regard to any judgment about its content.").  Thus, the

concepts of creating art and beauty and/or capturing purity and innocence are not defenses to a charge of production of child pornography in violation of § 2251(a).

Nor do these concepts supply a defense under the elements of a § 2251(a). As relevant here, what is prohibited is using or having a child engage in sexually explicit conduct for the purpose of capturing an image of that conduct. In defining that prohibition, Congress chose to employ the concept of "sexually explicit conduct," which includes the "lascivious exhibition of genitals or pubic area." United States v. Knox, 32 F.2d 733, 746 (3d Cir. 1994). Determining whether an image meets this definition involves an objective inquiry under the multi-factored test established in United States v. Dost, 636 F. Supp 828, 832 (S.D. Ca. 1986), which have come known as the "Dost factors." Id.[3] Those factors are:

   1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

   2) whether the setting of the visual depiction is sexually suggestive, *i.e.*, in a place or pose generally associated with sexual activity;

   3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

   4) whether the child is fully or partially clothed, or nude;

   5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and

   6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

Dost, 636 F. Supp. at 832.

In applying the Dost factors, the proper focus is on the photograph and the intended effect of the photograph and not what the defendant might perceive by or derive from viewing the image. Villard, 885 F.2d at 125 (merely because a defendant found or did not find a

---

[3] The Third Circuit adopted the Dost factors as the relevant test for determining lasciviousness in United States v. Villard, 885 F.2d 117, 122 (3d Cir. 1989).

picture to be arousing is outside the proper focus of whether an image constitutes an image of a child engaging in sexually explicit conduct and in this regard the sixth <u>Dost</u> factor "is useful as another way of inquiring into whether any of the other five <u>Dost</u> factors are met."). To hold otherwise would permit innocuous pictures of children to become images that violate § 2251(a) based solely on the subjective perception of the photographer or the possessor of the picture. <u>Id.</u> Thus, a subjective intent to create art and beauty or to capture innocence and purity is not relevant to the jury's inquiry of whether the images constitute sexually explicit conduct.

Finally, an intent to create art and beauty and/or to capture innocence and purity is not inconsistent with a photograph being an image of sexually explicit conduct. Instead, such an intent merely is compatible or consistent with creating images of children engaging in sexually explicit conduct. In other words, creators of images depicting children engaging in sexually explicit conduct may well believe that they are creating art and beauty or capturing innocence and purity. But such an intent or belief does not negate or displace the objective determination that the images are of sexually explicit conduct. Nor does such an intent or belief negate or displace the determination that a defendant had the child engage in such conduct for the purpose of capturing a depiction of that conduct. In short, every creator of child pornography may have such intentions, but the intention to create such "art or beauty" or to "capture such innocence and purity" does not by its existence exclude or otherwise negate an intent to capture an image of a child engaging in, for example, the "lascivious exhibition of the genitals of pubic area." As such, the mere existence of such intentions does not provide a defense to either the *actus reas* or *mens rea* required to convict under § 2251(a).

The issue to be presented to the jury is whether defendant violated § 2251(a) when he used his hand to expose the 5 year-old's vagina or used it to hold her leg up in the air to expose her genitals/pubic area or had the 3 year-old and 5 year-old display their naked backsides while draped over the bed, or had the 5 year-old  expose her breasts and pubic area with her pajama's unzipped and, at the same time, used his camera to capture depictions of these displays.  Defendant's abusive childhood, lifelong exposure to tragedy events, and maladaptive behaviors are not recognized defenses to the criminal liability the government seeks to establish.  The contention that an intention to create art and beauty or to capture innocence and purity constitutes a defense to this alleged conduct directly has been rejected by the Supreme Court.  And the asserted intentions to create art and beauty or capture innocence and purity neither constitute defenses to the elements of a § 2251(a) charge nor displace or negate the potential co-existence of the *actus reas* and *mens rea* the government is required to prove.  Introducing these concepts through expert testimony would therefore interject ill-defined concepts that would be confusing and have the potential to mislead the jury regarding the elements and evidence it is to consider in passing on defendant's guilt or innocence.  Consequently, the probative value of Dr. Schwartz's proposed testimony is substantially outweighed by its potential to confuse and mislead the jury and it will be excluded from the jury's consideration under Rule 403.[4]

---

[4] Defendant has not indicated he intends to testify to the jury about his asserted intent or purpose in taking the pictures and the record otherwise suggests that defendant is not intending to so testify.  Accordingly, the court has assumed that additional information bearing on the Rule 403 analysis would not become available at trial.  In the event defendant elects to take the stand and testify under oath as to his purpose in causing the displays of the children engaging in sexually explicit conduct while using a camera to capture images of the same, he may thereafter seek reconsideration of the Rule 403 portion of the above analysis to the extent doing so is appropriate and warranted by the expanded record.

For the reasons set forth above, defendant's notice/motion to proceed with the expert testimony of Dr. Schwartz on the issue of *mens rea* will be denied and the government's motions to exclude will be granted.  An appropriate order will follow.

 Date: February 18, 2021

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc:     Christian A. Trabold, AUSA
        Andrew Lipson, AFPD

        (*Via CM/ECF Electronic Mail*)